FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
United Shipping Agency SRL
80 Pine Street
New York, NY  10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BAJA FERRIES USA L.L.C., | 08-cv-06031 (DC) |
| Plaintiff, | |
| - against - | |
| CALDER SEACARRIER CORP., FENBY CO. LTD., UNITED SHIPPING AGENCY SRL, BRISTOL MARINE CO. LTD. and BML CHARTERING, | |
| Defendants. | |

## DEFENDANT UNITED SHIPPING AGENCY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE ATTACHMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................ii

PRELIMINARY STATEMENT............................................................................1

SUMMARY OF ARGUMENT...............................................................................1

SUMMARY OF FACTS.........................................................................................3

    A.    The Charter Parties ..............................................................................4
    B.    USA Acted "As Agents Only" and No contract with
        Unishipping or Baja Exists...................................................................5
    C.    USA Released the "Freight Prepaid" Negotiable Bills of Lading in
        Accordance with the Governing Charter Party and Agency
        Appointment..........................................................................................6
    D.    The Instant Action ................................................................................7

POINT I:

PLAINTIFF BEARS THE BURDEN OF PROOF UNDER
SUPPKLEMENTAL ADMIRALTY RULES B AND E................................................9

POINT II:

BAJA HAS NOT STATED A *PRIMA FACIE* MARITIME
CLAIM AGAINST USA.........................................................................................11

    A.    Standards of Review............................................................................11
    B.    There is no Causation between USA's Alleged Actions and Baja's
        Injuries, and As Such, There is Simply No *Prima Facie* Claim............................12
    C.    In the Alternative, There is no *Prima Facie* Valid Maritime Contract
        Claim....................................................................................................15
    D.    In the Further Alternative, There is no Valid *Prima Facie* Maritime Tort Claim..18

POINT III:

THE FUNDS RESTRAINED ARE NOT ATTACHABLE ASSETS OF
DEFENDANT USA................................................................................................19

CONCLUSION....................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*AET Inc. Ltd. v. Procuradoria De Servicos Martimos Cardoso & Fonesca,*
    464 F.Supp.2d 241 (2006) ........................................................................21

*Allied Maritime, Inc. v. The Rice Corporation,* 2004 AMC 2450 (Oct. 12, 2004) .......................10

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.,* 460 F.3d 434 (2d Cir. 2006)............9, 10, 12

*Bender Shipbuilding & Repair Co., Inc. v. M/V Drive Ocean V,*
    2000 AMC 1958 (S.D. Cal. 1998)...........................................................16

*Bottiglieri Di Na Vigazione Spa v. Tradeline LLC,*
    2007 WL 404657 (S.D.N.Y.Feb. 6, 2007) .............................................10

*Broughton v. Florida Int'l Underwriters*, 139 F.3d 861 (11th Cir. 1998).....................................19

*Cargill Ferrous Int'l v. M/V Sukarawan Naree*, 1998 AMC 566 (E.D. La. 1997) .........................17

*Centauri Shipping Ltd. v. Western Bulk Carriers KS,*
    2007 WL 3378254 (S.D.N.Y. Nov. 5, 2007)...........................................10

*Chiquita Int'l Ltd. v. MV Bosse*, 518 F.Supp.2d 589 (S.D.N.Y. 2007) .........................................21

*Cragin & Co. v. Int'l S.S. Co.*, 15 F.2d 263 (2d Cir. 1926)............................................................22

*Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261 (S.D.N.Y. 2007).........................10

*Fednav. Ltd. v. Isoramar, S.A.,* 925 F.2d 599 (2d Cir 1991)........................................................16

*Filner v. Shapiro*, 633 F.2d 139 (2d Cir. 1980) ..........................................................................23

*Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84 (5th Cir. 1979)...............................................13, 14

*Harvey Brokerage Co. v. Ambassador Hotel Corp.*, 57 F.2d 727 (S.D.NY. 1932) ......................23

*In re Madison Coal & Supply Co,* 321 F. Supp. 2d 809 (S.D. W. Va. 2003) ...............................18

*J.K. Int'l Party, Ltd. v. Agriko S.A.S.,* 2007 WL 485434
    (S.D.N.Y. February 13, 2007) .................................................................9

*Jerome B. Grubhart, Inc. v. Great Lakes Dredge and Dock Co.,* 513 U.S. 527 (1995) .........18, 19

*Maersk, Inc. v. Neewra, Inc.*, 443 F. Supp. 2d 519 (S.D.N.Y. 2006)............................................11

*Maritima Petroleo E Engenharia Ltda. v. Ocean Rig 1 AS,*
    78 F. Supp. 2d 162 (S.D.N.Y. 1999) ...............................................................10, 11

*McGuire v. City of New York,* 192 F. Supp. 866 (S.D.N.Y. 1961) .....................................9, 18, 19

*Norfolk Southern Railway v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14 (2004) .............................16

*Norton v. Larney,* 266 U.S. 511, 515 (1925)...............................................................................11

*Oceanic Trading Corp. v. The Freights, Sub-Freights and/or Demurrage*
    *of the M/V Diana,* 1970 AMC 351 (2d Cir. 1970) ......................................................13

*OGI Oceangate Transportation Co. Ltd. v. RP Logistics Pvt. Ltd.,*
    2007 WL 2900225 (S.D.N.Y. October 4, 2007)...................................................9, 10

*Padre Shipping v. Yong He Shipping,* 553 F.Supp.2d 328 (S.D.N.Y. 2008) ....................13, 17, 21

*Ramirez v. Butler,* 319 F. Supp. 2d 1034 (N.D. Cal. 2004)........................................................12, 15

*Royal Swan Navigation Co. v. Global Container Lines,*
    868 F. Supp. 599 (S.D.N.Y. 1994) ...............................................................................10

*Shipping Fin. Serv. Corp. v. Drakos,* 140 F.3d 129 (2d Cir. 1998)..............................................12

*Sission v. Ruby*, 497 U.S. 358 (1990) ..........................................................................................18

*Smith v. Mitlof*, 198 F. Supp. 2d 492 (S.D.N.Y. 2002).................................................................11

*T & O Shipping Ltd. v. Source Link Co.,* 2006 WL 3513638 (S.D.N.Y. Dec. 5, 2006)..................9

*Trade Arbet Inc. v. M/V Kandalaksha,* 2003 AMC 1731 (S.D.N.Y. 2003) ..................................17

*Wajilam Exps. (Singapore) Pte, Ltd. v. ATL Shipping Ltd.,*
    475 F. Supp. 2d 275 (S.D.N.Y. 2006) ....................................................................10, 11

*Wilhelmsen Premier Marine Fuels v. UBS Provedores Pty. Ltd.,*
    519 F. Supp. 2d 399 (S.D.N.Y. 2007) ..........................................................................10

*Winter Storm Ship., Ltd. v. TPI,* 310 F.3d 263 (2d Cir. 2002)..............................................20, 21

**Other Authorities**

29 *Moore's Federal Practice*, §7.05.04 [5] (3d ed. 2005) ...........................................................10

Grant Gilmore & Charles Black, *The Law of Admiralty* §4-17 p. 233 (1987) .............................14

*Grismore On Contracts* §53 ........................................................................................................16

Supplemental Admiralty Rule B........................................................................................................9

Supplemental Admiralty Rule E.........................................................................................................9

Thomas J. Shoenbaum, *Admiralty & Maritime Law*, §21-2 at 471 (2d ed. 1999) ........................16

## PRELIMINARY STATEMENT

Defendant United Shipping Agency SRL ("USA") submits this memorandum in support of its application to vacate the Rule B maritime attachment obtained by Plaintiff Baja Ferries USA L.L.C. ("Baja") over any assets of USA. For the reasons explained herein, the attachment should be vacated in its entirety.

## SUMMARY OF ARGUMENT

This is a case about Baja's alleged non-receipt of a portion of a freight payment due to it by its contracting partner, Defendant Calder Seacarrier Corp. ("Calder"). But, this is not a situation in which Calder supposedly never remitted the entire payment to Baja. As Baja admits, Calder remitted the entire freight payment due to Baja, but because of an attachment order against Calder, a portion of that freight was frozen. A quick review of the S.D.N.Y. docket reveals that Calder has had numerous Rule B attachments filed against it in recent years, two of which were pending at the time of the performance of this particular charter party voyage. Having voluntarily dealt with an entity against which an attachment existed that was a matter of public record and having agreed to deal with that entity in U.S. dollars, Baja now seeks to hold Defendant USA hostage for Baja's failure to conduct due diligence with its contracting partner. Baja's effort is a misdirected arrow.

USA was not a party to the charter party contract between Baja and Calder. USA, in fact, never even saw a copy of the charter. Baja never appointed USA to act as its agent and never paid USA a dime. USA was appointed by Bristol, a sub-charterer. Nonetheless, Baja seeks to hold USA responsible for the portion of freight captured by the Calder attachment and the alleged inability to exercise a lien on the cargo, claiming that USA is liable under contract and tort theories for releasing the bills of lading after freight had been remitted throughout the charter

party chain. As explained below, Baja's allegations fail to state a *prima facie* valid maritime claim against USA, a necessary prerequisite to the maintenance of the attachment.[1] Furthermore, and with respect to the particular funds that have been restrained, Defendant USA does not have an attachable interest in those funds and thus the attachment should be vacated on this basis as well.

At the outset, it is abundantly clear that the alleged actions of USA whether grounded in contract or tort theories had nothing to do with the alleged injuries suffered by Baja. Baja claims that it did not receive the full freight owed from Calder, but it was the attachment against Calder which blocked this payment. The release or non-release of the bills of lading had nothing to do with the receipt of the payment. Apparently realizing this, Baja argues that the release of the bills of lading prevented it from exercising a lien on the cargo. Yet, as explained below, Baja would have had no lien on the cargo regardless of the release of the bills of lading. Thus, there is an utter lack of causation for the claim asserted against USA. Baja's real dispute is with Calder, Baja's chartering partner.

Furthermore, and with respect to the contract claims asserted by Baja against USA, there is no evidence that USA entered into a binding agreement directly with Baja. The charter party which Baja alleges USA breached is not one to which USA was a party and Baja cannot support the allegation that it was. The alleged explicit agreement between Baja and USA, purportedly reflected in an exchange of e-mails, similarly did not create any binding agreement or obligation on USA. Further, USA's alleged agreement with Baja to prepare and issue certain documents does not give rise to a maritime claim in the circumstances of this particular case. Baja's contract

---

[1] As explained below, although the Court will not address the merits at this attachment stage, USA submits that Baja is required to make a threshold showing that USA is a proper party to the claims herein which serve as the basis of the attachment. Thus, the Court is free to examine the evidence and arguments submitted herein to determine if USA is indeed a property party herein and if Baja has stated valid prima face maritime claims against it.

claims against USA thus fail to meet the requirements of stating a *prima facie* valid maritime claim to support the Rule B attachment.

Because there was no contract with USA, Baja is left with its alleged tort claim, which is based upon an alleged breach of duties as a bailee. As explained more fully below, the alleged actions supporting this tort-like claim fail to satisfy the necessary test for establishing admiralty tort jurisdiction. As such, the tort claim is not one which could support a Rule B attachment.

Finally, and as explained above, the funds which have been restrained pursuant to the order of attachment against USA are ones specifically earmarked for another ship owner who has no involvement with the dispute at hand. USA was acting merely as a conduit through which the ship owner could transfer funds to be exchanged into cash and paid to the crew of this other vessel. As such, USA had no attachable property interest in the funds and the attachment should be vacated.[2]

### SUMMARY OF FACTS

This matter involves a series of contractual relationships concerning the six named parties. Each relationship was distinct from the rest and bound only those parties that were privy to it. Based on the accompanying Declaration and Supplemental Declaration of Mihai Felescu, Declaration of Jang Kil, Kim (the owners of the M/V JUPITER BRIGHT), and Declaration of Claire Bilton, and exhibits annexed thereto, the following reflects the scope of those relationships as they concern the two parties at issue, Plaintiff Baja and Defendant USA.

---

[2] As explained more fully below, the facts of this case are distinguishable from others in which the Court has maintained the restraint over funds moving in the name of an agent on behalf of an owner unconnected to the dispute subject of the attachment.

A.    **The Charter Parties.**

The M/V RENATA is owned by Vilara Maritime and managed by Oceanstar Management Inc. On information and belief, Vilara Maritime, as owner, entered into a charter party with Plaintiff Baja, as charterer on a time charter basis.

Plaintiff Baja, as disponent owner,[3] then entered into a charter party dated June 6, 2008, with Defendant Calder Seacarrier Corp. ("Calder"), as charterer, for the carriage of certain cargo aboard the M/V RENATA (the "Baja-Calder charter").[4]

By a separate voyage charter party, dated that same day, Defendant Calder, as disponent owner, sub-chartered M/V RENATA to Defendant Bristol, as charterer, also for the carriage of certain cargos aboard the vessel (the "Calder-Bristol charter").

In turn, by another separate voyage charter party, also dated that same day, Defendant Bristol, as disponent owner, further sub-chartered the vessel to non-party Interagro, as charterer, to carry a cargo of fertilizer, in bulk from Constanza, Romania to Mombasa, Kenya (the "Bristol-Interagro charter"). (*See* Felescu Decl. ¶5, Exhibit A). Under the terms of that charter, Interagro nominated and Bristol appointed Defendant USA to act as Bristol's load port agents during the vessel's call to Constanza. (Felescu Decl. ¶5, Exhibits A at page 4 and clause 42, Ex. B and Ex. C; Felescu Supp. Decl. ¶4).

In consideration for USA's services as agents appointed by Bristol, Bristol was obligated to pay and did pay USA's agency fee. (Felescu Decl. ¶5; Felescu Supp. Decl. ¶4; Exhibit C). Defendant USA was not a party to any of the charter parties related to the subject voyage. There is no dispute that USA acted as agents only and was appointed by Bristol. (Felescu Decl. ¶5;

---

[3] A disponent owner such as Baja is not the registered owner of the vessel but instead is a charterer who is chartering the vessel from another entity higher up in the charter chain.

[4] USA still has not seen a copy of the Baja-Calder charter and bases its summary of the facts herein, in part, on the allegations of Baja's complaint. (Felescu Supp. Decl. ¶4)

Felescu Supp. Decl. ¶4; Exhibit A at page 4 and Rider Clause 42, Exhibits B and C). There is no evidence otherwise.

**B.    USA Acted "As Agents Only" and No Contract with Unishipping or Baja Exists.**

The M/V RENATA arrived at Constanza on June 13, 2008, and commenced her loading of the subject cargo of fertilizer. On June 13, 2008, pursuant to the Bristol-Interagro charter, Interagro requested "Freight Prepaid" bills of lading, which USA prepared and marked accordingly. (Felesco Decl. ¶7; Felesco Supp. Decl. ¶5; Exhibits D and J). The Bristol-Interagro charter provided that Interagro had the option of requiring "Freight Prepaid" bills of lading. (Felesco Decl. ¶7; Felesco Supp. Decl. ¶5; Exhibit A at p. 4 and clause 30). If the option was exercised, one of USA's duties was to release the bills of lading "only upon" Bristol's receipt of a swift copy from Interagro's bank confirming that freight had been remitted to Bristol's nominated bank account. (*Id.*).

Before loading operations were completed and the bills of lading were released, non-party Unishipping, acting as agents for Baja, began sending a series of emails to USA demanding that no bills of lading be released until Unishipping's prior consent. (Felescu Decl. ¶¶ 6, 8; Felescu Supp. Decl. ¶¶ 6, 7; Exhibit E). USA, though, was under no obligation and would be in breach of its agency appointment to follow instructions from anyone other than its principal. (Felescu Decl. ¶10). USA was not a party to and had no knowledge of the terms of the Baja-Calder charter, and thus, could not have agreed and never did agree to prepare, issue or release bills of lading in accordance with any charter other than the one under which USA was appointed. (Felescu Decl. ¶¶ 6, 8, 10; Felescu Supp. Decl. ¶¶ 6, 8, 10, 11). Accordingly, on June 18, 2008 10:34 AM, USA advised that it would have to check with its principals regarding Unishipping's request. (Felescu Supp. Decl. ¶8; Exhibit E). Within the hour, USA informed

Unishipping that it acted as agents for its principal and that Unishipping should address its instructions through its contracting party in the charter chain. (*Id.*).

Unishipping, however, persisted and in a subsequent email exchange on June 18, 2008, USA confirmed that it would act "accordingly," indicating that USA would act in line with the contract/authorizations already received from its principal, with which USA had a clear, exclusive, binding contract/agency appointment. (Felescu Supp. Decl. ¶¶ 9-10; Exhibit E). USA's intent – to honor its contractual relationship with its principal – had already been indicated in the earlier email exchanges with Unishipping in which USA explained that it was appointed as agents and that any instructions regarding the bills of lading should be addressed through Unishipping's contractual party. (*Id.*). USA was never appointed to act as agents by Unishipping or Baja, never received any form of payment from them and never agreed to act in accordance with their instructions or in accordance with their charter party to which USA was not a party and had never seen. (Felescu Decl. ¶¶ 6, 8; Felescu Supp. Decl. ¶¶ 6, 8, 10, 11).

**C.    USA Released the "Freight Prepaid" Negotiable Bills of Lading In Accordance with the Governing Charter Party and Agency Appointment.**

After the cargo was loaded aboard the vessel, the Master signed and issued two "Freight Prepaid" bills of lading dated June 18, 2008. (Exhibits D and J). The bills of lading did not specifically incorporate any particular charter party or specifically mention any of the four charters which could have been incorporated. (*See* discussion of the Charter Parties above; Exhibit D and J). Interagro was identified as the "shipper" on the bills of lading and Interagro paid the freight due. (Felescu Decl. 9; Exhibits D, F, and J). In accordance with its duties as agents appointed under the Bristol-Interagro charter, USA did not release the original bills of lading until it received the swift copy from Interagro's bank confirming the irrevocable payment of freight to Bristol's bank account and Bristol's written instructions to release the bills of lading.

(Felescu Decl. ¶10; Felescu Supp. Decl. ¶5; *see* Exhibits A, E, F, and G). If USA had not released the bills of lading upon Interagro's payment of the freight, USA would have been in breach of its agency agreement and the law. (Felescu Decl. ¶10). USA thus fully complied with its agency appointment and the Bristol-Interagro charter. (Felescu Supp. Decl. ¶5; Exhibit A).

## D.    The Instant Action.

According to Baja's complaint, the freight payment due it under the Baja-Calder charter was remitted by Calder, via Defendant Fenby (presumably an agent of Calder). (Verified Complaint ¶14). A portion of the payment however was captured pursuant to an order of attachment issued in a case pending in the S.D.N.Y. entitled *"Goodearth Maritime Ltd. v. Calder Seacarriers Corp., Rolston Enterprises, and Fenby Company Ltd."* and bearing docket no. 08-cv-2028 (RMB) (the "Calder Attachment Action"). (Calder and Fenby are both named as Defendants here). The Calder Attachment Action has been pending since at least March 2008 and was pending at the time that Baja entered into the Baja-Calder charter party in June 2008. The fact that a portion of the freight owed by Calder could be attached was thus a matter of public record when Baja entered into the charter.

Notwithstanding its obvious failure to exercise due diligence, Baja now claims that USA somehow was bound to hold on to the bills of lading until all of the freight owed by Calder was received into Baja's account. Baja claims that USA was obligated to so act in accordance with the Baja-Calder charter, a charter which USA never saw and was never provided, (Felescu Supp. Decl. ¶6), and that USA breached the Baja-Calder charter by releasing the bills of lading in accordance with the Bristol-Interagro charter.[5] (*See* Verified Complaint ¶38). Baja also claims

---

[5] While USA still has not seen a copy of the Baja-Calder charter on which Baja relies, if the terms of that charter concerning freight prepaid bills were the same as the terms of the Bristol-Interagro charter, then there was no breach. The Baja-Calder charter would (presumably) have allowed release of the bills of lading upon receipt by Baja of a swift copy from Calder's bank confirming that the freight had been

that the series of emails (in which USA made it clear that it was acting as agent for its principals and that Baja should make its request through the contractual chain) somehow created a binding agreement between Baja and USA. Baja thus claims that USA is liable for the amount captured by the Calder attachment and for the alleged inability of Baja to exercise a lien on the cargo for the balance of freight owed. (*See* Verified Complaint ¶¶ 38, 40). As explained below, the allegations against USA are insufficient to state a valid *prima facie* maritime claim and accordingly the attachment against USA should be vacated.

Pursuant to the attachment order, Baja froze an electronic funds transfer being sent from non-party Stx Pos Management Co. (unrelated third party and principal of USA) to USA as agents, the entire amount of which USA was to convert to cash and provide to the Master of an unrelated vessel (the M/V JUPITER BRIGHT) during a crew change at the port of Constanza, and paid to departing seaman as wages. (Felescu Decl. ¶¶ 12, 13; Kim Decl. ¶7-9; Exhibits H, and I). The funds that were frozen were urgently needed to pay the departing crew to avoid having the vessel arrested by an unpaid crew.[6] These funds are not attachable assets of USA under the Admiralty Rules, and for the reasons below, the attachment should be vacated.

---

remitted. Baja admits in its complaint that the freight was indeed remitted by Calder. (Verified Complaint ¶14). The fact that a portion of the freight was stopped in transit to Baja's bank account due to an attachment does not change the fact that it was remitted by Calder. Consequently, Baja's claim of breach has no traction, if the terms of the Baja-Calder charter are similar to the Bristol-Interagro charter under which USA was appointed.

[6] As such, USA applied and the Court granted an expedited hearing on USA's emergency application to vacate the attachment. The Court reserved decision on the motion and requested legal memoranda on the issues raised in the application.

## POINT I

### PLAINTIFF BEARS THE BURDEN OF PROOF
### UNDER SUPPLEMENTAL ADMIRALTY RULES B AND E.

Maritime attachment is designed to allow parties in admiralty cases to secure jurisdiction over an absent party and to obtain security for a potential judgment where the absent party's assets are transitory. *See e.g., Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.,* 460 F.3d 434, 435, 437 (2d Cir. 2006). Maritime attachment, however, requires a showing that the claims at issue fall within the purview of admiralty jurisdiction, and thus the Court must evaluate the validity of Plaintiff Baja's claims under admiralty law in determining whether maritime attachment is appropriate. *See e.g. OGI Oceangate Transportation Co. Ltd. v. RP Logistics Pvt. Ltd.,* 2007 WL 2900225, at *2 (S.D.N.Y. October 4, 2007); *McGuire v. City of New York,* 192 F. Supp. 866, 870 (S.D.N.Y. 1961) ("[n]ot every tort committed on admiralty waters may be redressed in the admiralty courts").

Furthermore, pursuant to Supplemental Admiralty Rule E(4)(f), in any circumstance where property is attached and a challenge to that attachment is presented, it is the "***Plaintiff [who is] …required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.***" *See* Rule E(4)(f). As explained by the Second Circuit in *Aqua Stoli,* the Admiralty Rules consequently "clearly place[] the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E." 460 F.3d at 445 n.5; *see also T & O Shipping Ltd. v. Source Link Co.,* 2006 WL 3513638, at *2 (S.D.N.Y. Dec. 5, 2006); *J.K. International Party, Ltd. v. Agriko S.A.S.,* 2007 WL 485434, at *2 (S.D.N.Y. February 13, 2007). Under the Rules, therefore, Plaintiff Baja is required to defend the attachment and bears the burden of proof to demonstrate why the attachment should not be vacated.

To maintain the attachment, therefore, Baja must demonstrate: (a) that it has a valid *prima facie* admiralty claim against USA; (b) that USA cannot be found within this District; (c) that USA's property may be found within the District; and (d) that there is no statutory or maritime law bar to the attachment. *Aqua Stoli*, 460 F.3d at 445. The Court must vacate the attachment if Baja fails to sustain its burden of showing that it has satisfied these four requirements of Rules B and E. *Id.*[7]

Both the courts and legal commentators have recognized that the burden placed upon an attaching plaintiff such as Baja in these circumstances is considerable, given the draconian nature of the attachment mechanism, which results in the freezing of assets without any prior opportunity to be heard. *See e.g. Allied Maritime, Inc. v. The Rice Corporation,* 2004 AMC 2450 (Oct. 12, 2004) (overruled on other grounds); *Royal Swan Navigation Co. v. Global Container Lines,* 868 F. Supp. 599, 606 (S.D.N.Y. 1994); 29 *Moore's Federal Practice,* §7.05.04 [5] (3d ed. 2005). A number of courts in this District apply a *prima facie* standard of proof, in which the court is to look only to the complaint in deciding whether plaintiff's attachment is valid. *See Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d.261, 266 (S.D.N.Y. 2007); *Wilhelmsen Premier Marine Fuels v. UBS Provedores Pty. Ltd.*, 519 F. Supp. 2d 399, 410 (S.D.N.Y. 2007). Other courts in this District apply a "reasonable grounds" standard, *see Wajilam Exps. (Singapore) Pte, Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275 (S.D.N.Y. 2006), in which the court does not limit its inquiry to the allegations of the complaint and instead

---

[7] Courts in this District have consistently vacated maritime attachments where the plaintiff fails to satisfy each of the four requirements of *Aqua Stoli. See e.g., Maritima Petroleo E Engenharia Ltda. v. Ocean Rig 1 AS,* 78 F. Supp. 2d 162, 171-172 (S.D.N.Y. 1999) (no admiralty jurisdiction where torts alleged were not committed on navigable water); *OGI Oceangate,* 2007 WL 2900225, *2 (denying motion for reconsideration of vacatur and dismissing the complaint for failure to state admiralty claim); *Centauri Shipping Ltd. v. Western Bulk Carriers KS,* 2007 WL 3378254 at *1 (S.D.N.Y. Nov. 5, 2007) (vacatur of attachment appropriate where defendant was found to be present in the district); *Bottiglieri Di Na Vigazione Spa v. Tradeline LLC,* 2007 WL 404657, at 1-2 (S.D.N.Y. Feb. 6, 2007) (granting vacatur because plaintiff did not establish *prima facie* admiralty claim against the defendant).

considers any evidence offered in the parties' papers or at the post-attachment hearing. *See Wajilam*, 475 F. Supp. 2d at 279 (citing *Maersk, Inc. v. Neewra, Inc.*, 443 F. Supp. 2d 519, 527 (S.D.N.Y. 2006)).

In the instant case, the Court has already indicated at the hearing held on August 4, 2008, that the latter approach would apply here. Baja therefore must establish that it has reasonable grounds supporting each of the requirements of Rule B. As outlined more fully below, Plaintiff Baja cannot meet its burden of demonstrating that (i) it has a valid *prima facie* maritime claim against Defendant USA or (ii) the property restrained is property in which Defendant USA has a sufficient attachable interest. (*See* Points II and III, discussed below). Because Plaintiff cannot meet its burden of proof, vacatur of the attachment against Defendant USA is warranted.

## POINT II

### BAJA HAS NOT STATED A
### *PRIMA FACIE* MARITIME CLAIM AGAINST USA.

**A.    <u>Standards of Review.</u>**

It is undisputed that Admiralty Rule B can be invoked only when admiralty jurisdiction exists over the plaintiff's maritime claim against the defendant. *See* Rule B (the complaint must contain a "*prima facie* showing that the plaintiff has a maritime claim against the defendant"); Thomas J. Shoenbaum, *Admiralty & Maritime Law*, §21-2 at 471 (2d ed. 1999). The absence of admiralty jurisdiction is thus fatal to a Rule B attachment. *See Maritima*, 78 F. Supp. 2d at 166. Admiralty jurisdiction is afforded under 28 U.S.C. §1333(1), which grants district courts original jurisdiction over "any civil case of admiralty or maritime jurisdiction". The existence of admiralty jurisdiction must be shown affirmatively and that showing cannot be supported by drawing from the pleadings inferences favorable to the party asserting it. *Norton v. Larney,* 266 U.S. 511, 515 (1925) (federal court jurisdiction must be shown affirmatively); *Smith v. Mitlof,*

198 F. Supp. 2d 492, 497-98 (S.D.N.Y. 2002) (citing *Shipping Fin. Serv. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir. 1998)). Thus, in evaluating whether admiralty jurisdiction applies, "[n]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Ramirez v. Butler,* 319 F. Supp. 2d 1034, 1037 (N.D. Cal. 2004) (internal quotation and citation omitted).

In its complaint, Baja purports to state maritime causes of action against Defendant USA sounding in contract and tort, alleging that USA violated the terms of a charter party with Baja, the terms of an alleged express agreement between Baja and USA, and USA's duties as bailee of the bills of lading. (*See* Verified Complaint ¶¶ 1, 38). As explained below, there is no basis on which Baja can state a *prima facie* valid maritime contract claim against USA under any charter party or alleged agreement, and Baja's alleged tort claim does not satisfy the test for categorizing the claim as maritime. Each point is addressed below, but before doing so, USA addresses the issue of whether Plaintiff's complaint even states a valid claim against USA under ***any theory*** because of the clear lack of causation with the injuries alleged.

**B.     There is no Causation between USA's Alleged Actions and Baja's Injuries, and As Such, There is Simply No *Prima Facie* Claim.**

Under the directive of *Aqua Stoli,* the threshold issue of whether the nature of Baja's factual allegations give rise to a sustainable admiralty claim against USA must be examined. 460 F.3d at 445. This necessarily includes a review of whether the allegations support the assertion that USA's actions caused the complained of injuries to Baja. In its complaint, Baja alleges that it was injured by USA's release of the bills of lading because Baja did not receive full freight from its charterer Calder into its bank account and was therefore unable to exercise a

lien on the cargo at the discharge port for the balance not received. (Verified Complaint ¶¶ 38, 40). Neither of these injuries has any causal connection with the alleged actions of USA.

Turning first to the freight payment, Baja admits that its charterer Calder remitted the entire freight owed to Baja but that a portion of the freight was not received because of an attachment against Calder. (Verified Complaint ¶14). The release or non-release of the bills of lading had nothing to do with the attachment of the funds, and they would have been captured regardless of when the bills of lading were released. USA bears no fault for the capture of Calder's funds, and if there is any fault to be laid as between USA and Baja, that fault lies with Baja. The attachments against Calder were a matter of public record for months before Baja agreed to charter the vessel to Calder. Baja obviously failed to conduct due diligence and cannot now look to USA to pick up the pieces.

Baja's alleged inability to assert a lien on the cargo for the balance of the freight suffers from the same deficiency – it is wholly unconnected to the alleged improper release of the bills of lading. It is axiomatic that a registered vessel owner has a right under general maritime common law to exercise a lien on its charterer's own cargo for freight due under the charter, but that same right does not exist with a disponent owner (like Baja),[8] particularly when the cargo is owned by a third party (as is the case here)[9], absent a specific provision providing such a lien incorporated in the bill of lading. *Oceanic Trading Corp. v. The Freights, Sub-Freights and/or Demurrage of the M/V Diana*, 1970 AMC 351, 356 (2d Cir. 1970); *see also Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 86 (5th Cir. 1979) (where cargo owner is not a party to the contract for carriage, an owner cannot enforce a contractual lien against the owner's goods).

---

[8] This is another critical fact which distinguishes this case from *Padre Shipping v. Yong He Shipping*, 553 F.Supp.2d 328 (S.D.N.Y. 2008). There, Padre Shipping was the registered owner of the vessel.

[9] Baja's charterer, Calder, was never the owner of the cargo. (Bilton Decl. ¶¶ 6, 7).

Here, Baja could not under any circumstance have had a lien on the cargo under the bill of lading, as it was not even a party to the bills of lading. (*See* Exhibits D and J). The "owner" identified on the bills was Vilara Maritime, the registered owner of the vessel. (*See* Exhibits D and J). USA suspects that Baja will argue that it was granted a lien on cargo by virtue of the Baja-Calder charter, but even if that charter provided for a lien on cargo, the cargo owner was not a party to that charter (Bilton Decl. ¶5-7), and the terms of that charter were not effective against the remaining parties in the chain or any holder of the bill of lading in any event.

Moreover, as recognized by Gilmore & Black, the provision for liens on cargo and sub-freights can apply only when there is freight actually owing on a shipment of goods, and payment by the shipper discharges the lien. *See* Grant Gilmore & Charles Black, *The Law of Admiralty* §4-17 p. 233 (1987). In the circumstances here, every party in the charter chain paid full freight, including the shipper (Interagro) under the bill of lading. (*See* Felescu Decl. ¶9; Exhibit F). That is a fact which Baja cannot escape. As such, the release or non-release of the bills of lading had nothing to do with the alleged inability of Baja to assert a lien against the cargo. There can be no sustainable claim against USA. Baja's misdirected arrow pointed at USA should be returned to the quill, and the attachment vacated on this ground alone.[10]

---

[10] In fact, if Baja had either refused to release the freight prepaid bills of lading or tried to exercise a lien on the cargo, it would have been guilty of conversion. *Goodpasture*, 602 F.2d at 86. In *Goodpasture*, the vessel refused to issue freight prepaid bills of lading when its charterer failed to pay freight to it and it exercised a lien on the cargo. The cargo (like the cargo here) was not owned by the charterer. The district court concluded that the ship's failure to issue freight prepaid bills was not a conversion of the cargo. The Fifth Circuit reversed, finding that the owner of the ship had no lien against cargo not owned by the charterer and was liable in tort for holding the cargo hostage for payment of charter hire.

C.    **In the Alternative, There is no *Prima Facie* Valid Maritime Contract Claim.**

In its complaint, Baja seeks to ground its contract-type claim against USA on the terms of the Baja-Calder charter party and an alleged "express agreement" between Baja and USA. Neither supports the maintenance of the attachment here.

Turning first to the Baja-Calder charter, USA was not a party to any charter much less to the Baja-Calder charter. There is no evidence at all that USA ever entered into a charter party with Baja or agreed to be bound to any charter to which Baja was a party. In fact, USA never saw the Baja-Calder charter. Baja's insinuation that USA was a party to the Baja-Calder charter or agreed to be bound to its terms is insufficient as a matter of law to support the maintenance of the attachment. *Ramirez*, 319 F. Supp. 2d at 1037 (no presumptive truthfulness attaches to a plaintiff's allegations in determining whether jurisdiction exists).

As to the alleged express agreement, Baja's argument fares no better here. USA was appointed to act as an agent by Bristol. (Felescu Decl. ¶5; Felescu Supp. Decl. ¶4; Exhibits A-B). It was never appointed by Baja and did not enter into any agreement with it. (Felescu Decl. ¶8; Felescu Supp. Decl. ¶¶ 6, 10). The June 18, 2008, email on which Baja relies is insufficient for several reasons to create a binding agreement against USA on which the attachment here can be based. To begin, USA's reference in the email exchange that it would act accordingly was clearly in the context of the previous discussion that USA was an agent and would therefore act in accordance with the chain of contractual relationships and the authority granted by USA's principal. (*See* Felescu Supp. Decl. ¶¶ 8-11; Exhibit E). USA never agreed to be bound to Baja's instructions which differed from the instructions provided by USA's principal.

Furthermore, Baja never paid USA a dime or even offered to pay anything in consideration for the alleged agreement reached with Baja. (Felescu Decl. ¶6). Baja has no

evidence otherwise. The lack of consideration thus renders the agreement unenforceable in any event. *See e.g., Grismore On Contracts* §53 ("an informal promise is not per se enforceable in our law even though it has been assented to by the promise. Something more than mutual assets is, in general, essential to the creation of an informal contract. That something more we know as 'consideration'....Its orthodox meaning is that of an agreed price or exchange for a promise.").

More importantly, however, USA acted at all times as an agent for its principals, and Baja (through its agent Unishipping) knew USA was an agent only. Thus, USA submits that even if there was an agreement (which there was not), it was not directly with USA. Thus, the alleged agreement is an insufficient basis on which Baja's attachment against USA can be maintained.

Finally, the purported agreement, even though it relates to a bill of lading, does not satisfy the test for maritime contract jurisdiction in the circumstances of this case. The general rule regarding contracts serving as the basis of admiralty jurisdiction is that "the subject matter of the contract must be directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract relate in some preliminary (shoreside) manner to maritime affairs." 1 Schoenbaum §3-10 at 111; *see Fednav. Ltd. v. Isoramar, S.A.,* 925 F.2d 599, 601 (2d Cir 1991) (agreement to act as surety for another's breach of a charter party is non-maritime); *Norfolk Southern Railway v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 25 (2004) (adopting the nature and character test for maritime contract jurisdiction).

This is not an alleged agreement under which USA supervised the repairs, fueling, refurbishment, or supply of the vessel, activities which have been considered maritime in nature. *See e.g., Bender Shipbuilding & Repair Co., Inc. v. M/V Drive Ocean V*, 2000 AMC 1958, 1970 (S.D. Cal. 1998). The purported agreement is also not what is known as an "authorization letter"

from a master authorizing an agent to prepare, issue and sign bills of lading on behalf of the vessel. *Compare Padre Shipping v. Yong He Shipping*, 553 F.Supp.2d 328 (S.D.N.Y. 2008) (under letter of authorization, agent authorized to sign and did sign bills of lading on behalf of master); *Trade Arbet Inc. v. M/V Kandalaksha*, 2003 AMC 1731 (S.D.N.Y. 2003) (authorization letter referred to charter party and signing of bills by agent on behalf of master); *Cargill Ferrous Int'l v. M/V Sukarawan Naree*, 1998 AMC 566 (E.D. La. 1997) (referring to agent's authority to sign bills of lading on behalf of master).

This is instead an agreement (assuming what Baja says is true) under which USA is alleged to have performed certain land-based documentation activities for Baja involving the releasing of bills of lading on land, which were signed by the master and not on behalf of the master. The bills of lading were not the governing contract of carriage as the cargo was transported pursuant to a series of charter parties and the bills of lading were obviously not the trigger mechanism for payment of freight, as freight was indeed paid up the chain before the bills were released. Moreover, USA was not a party to the bills of lading, did not sign the bills of lading on behalf of the master, and was not a party performing any aspect of the carriage referred to in the bill of lading. (*See* Exhibits D and J). USA's alleged actions therefore in regards to handling the documentation did not relate directly and intimately to the operation of a vessel.

As such, even if the email on which Baja relies is considered some evidence of an agreement with USA (which USA maintains is incorrect), the agreement does not constitute a maritime contract in this case. Baja therefore cannot satisfy its burden of proving a valid *prima facie* maritime contract claim as required by Rule B.[11]

---

[11] This case is not similar to *Padre Shipping*, which involved a claim by an owner that its charterers' agent breached a "letter of authorization" issued by the master concerning the preparation, signing and release of the bills of lading on behalf of the master.

**D.     In the Further Alternative, There is no Valid *Prima facie* Maritime Tort Claim.**

As explained above, Baja also seeks to base its claim against USA on an alleged failure

of USA to honor its obligations as bailee of the bills of lading issued in connection with the

charter parties. (*See* Verified Complaint ¶38). That claim, even if it were true, is not maritime as

it does not satisfy the well-established test for an exercise of admiralty tort jurisdiction.[12]

The determination of whether allegations of tortious conduct give rise to admiralty

jurisdiction turns on whether conditions of ***both*** "location" and "connection with maritime

activity" are met. *Jerome B. Grubhart, Inc. v. Great Lakes Dredge and Dock Co.,* 513 U.S. 527,

534 (1995) (*citing* Extension of Admiralty Jurisdiction Act, 62 Stat. 496; *Sisson v. Ruby,* 497

U.S. 358 (1990) (to invoke admiralty jurisdiction pursuant to 28 U.S. §1333(1) over a tort claim

Plaintiff must satisfy both location and connection test); *see McGuire,* 192 F. Supp. at 868

("basis of admiralty jurisdiction must be combination of a maritime wrong and a maritime

location"). In applying the "location" test, a court "must determine whether the tort occurred on

navigable water or whether injury suffered on land was caused by a vessel on navigable water."

*Jerome B. Grubhart,* 513 U.S. at 534. Failure to establish the location test is fatal to an assertion

of admiralty jurisdiction, even if the connection test is met. *See e.g., In re Madison Coal &*

*Supply Co,* 321 F. Supp. 2d 809, 812 (S.D. W. Va. 2003).

Here, the location test is not met, as the alleged tortious conduct occurred on land and

does not involve an injury on land via a vessel. As explained by the Supreme Court in *Sisson,*

*Jerome B. Grubhart* and their progeny, the fundamental question the Court must consider in

evaluating the location test for purposes of admiralty jurisdiction is "whether the tort occurred on

navigable water or whether injury suffered on land was caused by a vessel on navigable water."

---

[12] To the extent a claim based on bailment can also be grounded in contract, USA maintains that there is
no *prima facie* valid maritime contract claim against it for the reasons explained above.

513 U.S. at 534. The allegations asserted in this case, constituting classic land-based bailment duties, did not occur on navigable water or cause injury on land via a vessel on navigable waters.

Plaintiff's complaint does not claim that the tort at issue (*i.e.* alleged improper land-based documentary exchanges) occurred on navigable water. Plaintiff instead asserts that the alleged tort injured it because it failed to receive the full freight payment from its charterer Calder into Baja's bank account and/or was unable to exercise a lien on the cargo at the discharge port. (Verified Complaint ¶¶ 38, 40). Yet, neither of these injuries is alleged to have been caused on or by a vessel in navigation. Accordingly, as is obvious on the face of the complaint, Plaintiff cannot satisfy the location test here. *Id.; see McGuire,* 192 F. Supp. at 871 (where allegations do not "relate to any tort which grows out of navigation" admiralty jurisdiction will not lie); *Broughton v. Florida Int'l Underwriters,* 139 F.3d 861, 865 (11th Cir. 1998) (tort claim against insurance broker for breach of duty to ensure financial soundness of underwriter and inform the insured before placing the cover not maritime because alleged tort did not occur on navigable waters or involve an injury on land caused by a vessel).

Because Baja cannot satisfy the location test for admiralty tort jurisdiction, its tort-like claim asserted against USA cannot support the maintenance of the attachment over USA's assets.

## POINT III

### THE FUNDS RESTRAINED
### ARE NOT ATTACHABLE ASSETS OF DEFENDANT USA.

Pursuant to the order of attachment against Defendant USA's property located within the District, a certain electronic funds transfer in the amount of $50,000.00 moving through a New York bank was restrained. Based on the accompanying Declarations submitted by the originator and beneficiary of the EFT, no part of those funds was transferred to satisfy a debt owed to USA or for USA's benefit. (*See* Felescu Decl. ¶13; Kim Decl. ¶¶ 5, 8; Exhibits H, and I). USA had

19

no attachable interest in those funds within the scope of the attachment order and consequently, the restraint of those funds was and remains to be wrongful, in violation of the order and Admiralty Rules.

Admiralty Rule B provides that a maritime plaintiff may "attach the defendant's tangible or intangible personal property." What it means for property to be both "tangible and intangible" under the law of the Circuit has been defined broadly and encompasses within it many forms of intangibles such as bank accounts, electronic funds transfers and debts owed to the defendant. *Winter Storm Ship., Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002). It has also been established that funds to which multiple parties have co-existing entitlement may still be attachable property of a defendant, however, as Profession Jarvis once cautioned, **the defendant's entitlement to a credit or interest in a debt or account receivable "*must be clear*."** *Winter Storm*, 310 F.3d at 276 (citing Robert M. Jarvis, *An Introduction to Maritime Attachment Practice Under Rule B*, 20 Journal of Maritime Law and Commerce 530 (October 1989) (footnotes omitted)). USA's entitlement to the restrained funds is anything but clear.

USA's operation is that of an agent acting for and on behalf of its clients-principals for the purpose of advancing the interests of others and not its own. (*See e.g.* Felescu Decl. ¶13). As illustrated by USA's efforts in acting as agents for its principal, Bristol, in this case, USA's only personal proprietary interest in its dealings as agents is the establishment and maintenance of its professional reputation as reliable and trustworthy agents by ensuring that its principals' financial interests are and will continue to be zealously and loyally advocated. It is only the commission and professional standing that flows therefrom that is property personal to USA. And, though it may go without saying, it is only that personal property in which an attachable interest of USA lies.

20

USA recognizes that there are three decisions which appear to have answered the question of whether there is an attachable interest in funds transferred to an agent to pay the expenses of a third party. *AET Inc. Ltd. v. Procuradoria De Servicos Martimos Cardoso & Fonesca*, 464 F.Supp.2d 241 (2006); *Chiquita Int'l Ltd. v. MV Bosse*, 518 F.Supp.2d 589 (S.D.N.Y. 2007); *Padre Shipping*, 553 F.Supp.2d 328. USA submits that these cases are distinguishable or inapplicable otherwise.

The decision in *AET* (the first case to address the point) rests in large part on the fact that the fund transfers to the agent that were allegedly earmarked for third parties were intermingled with funds earned by and owed to the agent. Here, the entire amount of the EFT being sent from non-party Stx Pos Management Co. to USA was to be converted into cash, advanced to the Master of the M/V JUPITER BRIGHT during a call to the port of Constanza and, ultimately, paid to the departing crew members as wages already earned. (Felescu Decl. ¶¶ 12-13; Kim Decl. ¶¶ 6-9). Thus, although the funds at issue were being transferred to USA's account, USA was truly acting as a mere pipeline to get the funds to the crew.[13]

In *MV Bosse*, Judge Leisure upheld the restraint of funds being transferred to the account of a vessel manager even though those funds were to be used for the accounts of other ship owners who were not involved in the subject dispute. Judge Leisure reasoned that simply

---

[13] This Court reasoned in *AET* that where "the majority of the money attached is [allegedly] not the 'property' of [the defendant agent] but rather the property of its customers, transferred to [it] for payment of expenses to third parties," the agent's attachable interest in those funds was real and akin to the attachable interest of the defendant in the funds at issue in *Winter Storm*, 310 F.3d 263. USA respectfully disagrees with this analogy in the circumstances here. In *Winter Storm*, it was the defendant (not a third party) who initiated the EFT and the funds were debited from the defendant's own bank account (not one of a third party) and sent directly to the actual beneficiary's account (not through a third party agent's account) in satisfaction of a debt owed by the defendant personally. The *Winter Storm* defendant's financial entitlement to and interest in those funds was manifest. This case is distinguishable. The EFT was initiated by a third party unrelated to this dispute and under the agency agreement, the funds, once received by USA, were to be converted into cash and dispersed to the crew of the M/V JUPITER BRIGHT. Thus, in essence, the funds at issue were being transferred from a third party (*i.e.* Stx Pos Management) to pay a debt owed to third parties (*i.e.* the crew).

because the funds were designated for the account of the manager, that was the end of the story. Judge Keenan similarly reasoned in *Padre Shipping* which involved fund transfers to a port agent and found that because the transfers at issue were sent to the account of the agent, they were attachable.

With all due respect, USA does not agree. The law is clear that only property in which a defendant has an interest can be attached. Thus, an analysis should be made as to whether the funds at issue are truly ones in which the defendant agent has an interest or whether those funds are for the payment of debts owed to and by third parties. There is no dispute here that the funds at issue were directly and immediately for the crew of the JUPITER BRIGHT. USA therefore submits that the instant case differs from the others which have addressed this issue and that those cases are not applicable here.

*Winter Storm* also does not support the continued restraint of the funds at issue. *Winter Storm* did not hold that a property interest somehow sprang up (instantaneously and fleeting) in favor of a beneficiary during the course of an EFT if no property interest existed either at the point of origin or destination (*e.g.* because the beneficiary was merely an agent). Similarly, *Winter Storm* did not hold that a property interest was created in an agent who was under a legal obligation to receive in trust a transfer of its client's funds where no property interest existed at origin or would have existed at the destination if the transfer had been completed.

Indeed, it is generally accepted that an agent who holds property on behalf of a principal does not have title to the property. *See e.g. Cragin & Co. v. Int'l S.S. Co.*, 15 F.2d 263, 264 (2d Cir. 1926) ("there [is] no mutual or successive relationship to property rights between agents and principals"). An agent that uses property entrusted to it by a principal in contravention of the principal's instructions can consequently be liable for conversion, and the principal can compel

the agent to turn over the property. *Filner v. Shapiro*, 633 F.2d 139, 141 (2d Cir. 1980); *Harvey Brokerage Co. v. Ambassador Hotel Corp.*, 57 F.2d 727, 730 (S.D.NY. 1932). USA therefore submits that in the circumstances of this case, USA did not and does not have an attachable property interest in the funds that have been restrained.

Finally, and while not dispositive, the equities in this case favor USA. The claim is half a million dollars and again stems from Baja's failure to exercise due diligence when contracting with Calder – something in which USA had no involvement. An agent like USA is essentially a service organization, and while it may handle millions of dollars of other people's money, it does not have millions of dollars of its own. It would be unrealistic and unjust to permit Baja to attach and ultimately recover against trust funds USA was receiving from its client (but not as a payment of any debts owed to USA by its client) in the circumstances of this case.

## CONCLUSION

For these reasons, USA requests that the attachment issued against its assets be vacated and USA be awarded any and other relief which the Court deems appropriate.

Respectfully submitted,

      /s/ Gina M. Venezia
Gina M. Venezia (GV1551)
Freehill, Hogan & Mahar, LLP
80 Pine Street
New York, New York 10005
Phone: (212) 425-1900
Fax: (212) 425-1901
Email: venezia@freehill.com
Attorneys for Defendant United Shipping Agency SRL

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all attorneys of record. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the below service list in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notice of Electronic Filing.

**VIA CM/ECF:**

James Peter Rau
Cardillo & Corbett
29 Broadway, Suite 1710
New York, NY 10006
Tel:  212-344-0464
Fax: 212-797-1212
Email: jrau@cardillocorbett.com


/s/ Gina M. Venezia
Gina M. Venezia